# THE ATTORNEY GENERAL
## OF TEXAS
AUSTIN, TEXAS 78711
ATTORNEY GENERAL


February 15, 1972

Honorable Harry P. Burleigh
Executive Director
Texas Water Development Board

Honorable Hugh C. Yantis, Jr.
Executive Director
Texas Water Quality Board

Gentlemen:

Opinion No. M- 1069

Re: Several responsibili-
ties and duties of state
agencies under Art. III,
Sec. 49-d-1 and Texas
Water Code, Sections
21.601 through 21.612,
inclusive.

You have requested our opinion in answer to ten
questions, to be hereinafter set out, and which relate to a
proper construction of the following portions of the Texas
Constitution and the Texas Water Code and the new state as-
sistance program for the building of sewage facilities.
Section 49-d-1, of Article III, Constitution of Texas, and
Subchapter I of the Texas Water Code (Acts of 62nd Leg., R.S.,
Chap. 612, pages 1980-1984).

We have re-grouped your questions in order to shorten
this opinion in answer thereto:

> Question 1. Can the Water Quality Board, in
> circumstances otherwise lawful,
> make a "direct loan" to a polit-
> ical subdivision of the State as
> a means of providing State finan-
> cial assistance for the construc-
> tion of waste treatment works?

> Question 2. Does the Water Development Board
> have discretion to determine the
> amount of bonds to be sold by the
> Water Quality Board in order to
> secure the most favorable interest
> rates for the State by taking into
> account factors such as the amount
> of Water Development Bonds out-
> standing, market conditions, prox-
> imity of sales of other State bonds

-5228-

and like factors; provided, of course, that Water Quality Enhancement Funds are available in sufficient amount to provide for the purchase of bonds or to fund "direct loans" to political subdivisions of the State as applications for the same are approved by the Water Quality Board?

Question 3.  Does the Water Development Board have any responsibility concerning the security of the State's investment in purchasing bonds of political subdivisions whose applications for State financial assistance are approved by the Water Quality Board, other than to provide the "comments and recommendations of the development fund manager relating to the best method for making financial assistance available?"

"Direct loans" are covered by Section 21.610, Texas Water Code which reads as follows:

"Section 21.610.  Direct Loans

"(a)  If a political subdivision in the judgment of the board is unable to issue bonds or other obligations for a project in the state for which a federal grant is to be made under the Federal Water Pollution Control Act, as amended, then the board may provide financial assistance to the political subdivision by agreeing to pay from water quality enhancement funds the amount required by federal law of the estimated reasonable cost of the project.

"(b)  Before the delivery of any water quality enhancement funds to the political subdivision, the board with the advice of the development fund manager and the political subdivision shall execute a loan agreement which

shall provide that the political subdivision
shall pay into the appropriate account not less
than the amount necessary to repay the principal
of and interest on the loan over the period of
time and under the terms and conditions which
are mutually agreeable to the Texas Water
Development Board and the political subdivision.
The contract may also include any other terms
and conditions which the board may require.

"(c)   Each political subdivision may
charge and collect necessary fees, rentals,
rates, and charges for the use, occupancy, and
availability of its treatment works and any of
its other properties, buildings, structures,
operations, utilities, systems, activities, and
facilities so that it may make all payments re-
quired by its loan agreement.  The political
subdivision shall pledge such amounts to make
those payments.

"(d)   Also, the political subdivision may
pledge its ad valorem taxes, if any, and levy
and collect the taxes for the purpose of making
all or any part of the payments required by its
loan agreement.  The taxes shall be in addition
to all other ad valorem taxes permitted by law,
but may not exceed, together with other ad
valorem taxes, any maximum imposed by the Texas
Constitution.

"(e)   Each loan agreement executed pursuant
to this Act, and the appropriate proceedings
authorizing its execution, shall be submitted to
the attorney general for examination before the
delivery of the money to the political subdivision.
If he finds that the loan agreement has been
authorized and executed in accordance with law,
that the provisions are valid, and that the
political subdivision has demonstrated to his
reasonable satisfaction that the payments re-
quired by the agreement can be made from the
sources pledged, he may approve the agreement."

Rules 300.1, 305.1, 305.2 and 305.3 (Chapter III, entitled "financial Assistant Direct Loans") of the "Joint Rules, Regulations and Policies of the Texas Water Quality Board and Texas Water Development Board' read as follows:

"300.1  STATE POLICY

"It is the intent that bonds purchased by the Development Board will be marketable in the municipal bond market, thereby providing a revolving fund for the continuing purchasing òf political subdivision bonds, and extending the use of the State bond program for water quality enhancement.

"Direct loans and obligations other than bonds are not marektable in the public market.  Therefore, it is the policy of the State of Texas to utilize direct loans or to purchase obligations other than bonds, to provide water quality enhancement funds only as a last resort.  A political subdivision will not be regarded as being unable to issue bonds because it is inconvenient or because an election will be required to authorize the issuance of bonds.  In the event of an unsuccessful election, and in other appropriate cases, the purchase of bonds pursuant to the Compact will be given preference over a direct loan or the purchase of obligations other than bonds."

"305.1  QUALITY BOARD CONSIDERATION OF APPLICATION

"No application for a direct loan shall be granted unless the Quality Board, with the advice of the development fund manager, shall find, after consideration as outlined in Rule 110.2(d), that:

"(a)   the applicant is unable to issue
bonds or other obligations for
construction of treatment works
for which a Federal grant is to
be made, and,

"(b)   the applicant has sources of reve-
nue which can be pledged, of not
less than the amount necessary to
repay the principal of and interest
on the loan over a period of time."

"305.2  LOAN AGREEMENT

"Before the delivery of any water quality
enhancement funds to the applicant, the Quality
Board shall, with the advice of the development
fund manager, execute a loan agreement providing
the time period for proper payment of principal
and interest to the appropriate account.

"Such loan agreement shall be agreeable
to the Development Board and shall be approved
by the Attorney General of Texas.  Such loan
agreement shall be accompanied by proof of the
matter set forth in Section 7.10(e) of Subchap-
ter G of the Texas Water Quality Act (Section
21.10[e], Texas Water Code).  If the loan agree-
ment is payable from revenues, the applicant
shall submit copies of rate orders and/or ordi-
nances setting utility rates, as well as certi-
fied copies of the engineer's projections of
income."

"305.3  APPLICATION INFORMATION

"Applicants contemplating financial as-
sistance by a direct loan shall comply with the
provisions of Sections 205.1, 205.2, and 205.3,
as appropriate, of these Rules.  It is especial-
ly important that these applicants consult with
the staffs of the Quality Board and Development
Board prior to submitting an application so as
to be properly informed as to the information
which will be required."

Honorable Harry P. Burleigh    (M-1069)
Honorable Hugh C. Yantis, Jr.
Page 6


        Section 11.141, Texas Water Code (formerly Art.
8280-9a, V.C.S.) authorizes the Water Development Board to
issue a maximum of $200,000,000 of bonds, Tex. Const., Art.
III, Sec. 49-c and 49-d.  While these Sections of the Consti-
tution were not self-enacting as to the issuance of bonds,
Section 49-d-1, Subdivision (a) of Article III (adopted May
18, 1971) in its relevant portion, reads:

            "The Texas Water Development Board
        shall upon direction of the Texas Water
        Quality Board...issue additional...Bonds
        up to an additional aggregate principal
        amount of One Hundred Million Dollars...
        to provide...for water quality enhancement
        purposes as established by the Legisla-
        ture...."

Issuance of these bonds is implemented by Subchapter I of
Article I of Chapter 21, (Section 21.601 through Section 21.612)
of the Texas Water Code.  Acts, 62nd Leg., R.S., 1971, Chap.
612, pages 1980-1984.

        Our answer to Questions Numbers 1, 2 and 3 are in
the affirmative, except, we hold that for a direct loan to
be made "in circumstances otherwise lawful" (as stated in
your Question No. 1) the loan must have the approval of both
the Texas Water Quality Board and the Texas Water Development
Board as the collaborative state agency created by the Consti-
tution to act as the fiscal agent of the State for state water
projects.  However, the Texas Water Development Board cannot
consider any applicant for a "water quality enhancement" loan
unless such applicant is favorably proposed or nominated by
the Texas Water Quality Board.

        Sections 49-c, 49-d and 49-d-1, Texas Constitution,
and all Texas Water Code provisions relating to the Texas
Water Development Board and the Texas Water Quality Board
must be read in pari materia so as to harmonize all of these
constituional and statutory provisions. Purcell vs. Lindsey,
158 Tex. 541, 314 S.W.2d 283 (1958); Yeary vs. Bond, 384 S.W.2d
386, (Tex.Civ.App. 1964, error ref. n.r.e.); 12 Tex.Jur.2d,
Const. Law, Sec. 27 and 29, pages 371 and 374.

        A fair construction of these constitutional and
statutory provisions in our opinion is that the people have

created a "revolving fund" in the State Treasury for the
building, purchasing or maintaining of water projects as such
are defined in these laws.  The intent and purpose of the
fund is to make loans and thus to lend state aid on a "pay-
back with interest" basis under Article III, Section 49-d-1,
Texas Constitution and its implementing statutes.  A reading
of Subchapter I, (Sections 21.601 et seq.) of Chapter 21,
Texas Water Code, shows that while the Texas Water Quality
Board has the "sole responsibility and authority for selecting
the political subdivisions to whom (Art. III, Sec. 49-d-1)
financial assistance may be provided" (Section 21.606, Sub-
division [c]), and while Texas Water Quality Board in making
its decisions does "not require the concurrence or approval
of any other...governmental entity (Subdivision [e] of Sec-
tion 21.606), these provisions must be read in harmony with
Subdivision (d), (e), (f), (h) and (j) of Section 21.609,
Texas Water Code, which read as follows:

> "(d)  Except as specifically provided
> in this subchapter, water development bonds
> authorized under Article III, Section 49-d-1,
> of the Texas Constitution shall be issued and
> sold and financial assistance from the water
> quality enhancement account shall be provided
> in the same form and manner as provided in
> Chapter 11 of this code, for issuing and sell-
> ing other bonds and making other financial
> assistance available to political subdivisions.

> "(e)  The Texas Water Development Board
> shall deliver funds pursuant to an applica-
> tion for financial assistance on request of
> the board.

> "(f)  The Texas Water Development Board
> shall use the money in the water quality en-
> hancement account to purchase bonds or other
> obligations of any political subdivision and
> for making direct loans for the purpose of
> providing money to the political subdivision
> for construction of treatment works.

> ". . .

> "(h)  The Texas Water Development Board
> shall establish within funds previously created

appropriate accounts for separate handling of
money derived from payment of interest of and
principal on bonds and other obligations pur-
chased from political subdivisions and repay-
ment of direct loans made to political subdi-
visions.

". . .

"(j)   The Texas Water Development Board
may perform any acts which are necessary to
carry out its functions under this subchapter."

It is our opinion that the above laws and the con-
stitutional powers reposed by the people in the Texas Water
Development Board show that even though the expertise of
finding qualified applicants and of supervising construction
of sewage plants is to be done through the Texas Water Quality
Board, the present statute does not divest the Texas Water
Development Board of its most necessary duties.  The Consti-
tution and statutes contemplate use of the fiscal expertise
of the Texas Water Development Board to determine when to
sell State bonds, and how to safeguard the revolving fund
by supervision of the purchases of local bonds, or by execu-
tion of direct loan agreements.

We construe the law to require that both Texas
Water Quality Board and Texas Water Development Board must
approve any financial transactions under Article III, Sec-
tion 49-d-1, Texas Constitution, and Sections 21.601, et seq.,
of the Texas Water Code.  Rule 210.2(c), Joint Rules of Texas
Water Development Board and Texas Water Quality Board.

We note that Section 11.141 clearly authorizes only
the Water Development Board to issue water development bonds.
It alone, under Section 11.412, may purchase bonds.  By these
Sections this Board seems to be clearly designated as the sole
fiscal agent of the State having final discretion as to both
the issuance and purchase of these bonds.  Our consideration
of all the applicable provisions of law leads us to the con-
clusion that both the Texas Water Quality Board and the Texas
Water Development Board must collaborate in considering appli-
cations for state aid in this field, but that the final deter-
mination as to issuance of bonds rests with the Water Develop-
ment Board, based upon the conditions and requirements pre-
scribed by Section 11.412 and "other conditions and require-
ments" the Water Development Board "considers to be consistent

with sound investment practices and in the public interest."
Section 21.609 concerns the subject of providing financial
assistance and in its subdivision (d) expressly requires
that it shall be provided "in the same form and manner as
provided in Chapter 11 of this Code, for issuing and selling
other bonds. . ."

In addition, a "direct loan" would require approval
by the Attorney General under Section 21.610(e).

In answer to Questions 1, 2 and 3, neither agency
has conclusive authority so as to preclude disapproval by
the other agency, except that no Article III, Section 49-d-1
loan can be considered or approved unless it is favorably
recommended by the Texas Water Quality Board; nor can the
Water Quality Board preempt the Water Development Board from
performing its constitutional, statutory and discretionary
duties of making a "Water Quality Enhancement Account" avail-
able as a revolving fund by giving adequate supervision to
the financial arrangements necessary to protect such consti-
tutional revolving fund.

We are thus unable to accept the contention that
Article III, Section 49-d-1, Texas Constitution, together
with Sections 21.603, 21.606, 21.608 and 21.609(e), Texas
Water Code, have the effect of vesting full discretion and
authority in the Texas Water Quality Board in the matter of
financial assistance to political subdivisions through the
purchase of bonds or other obligations of such subdivision,
thereby impliedly repealing Section 11.412(b) of the Water
Code.

The rule of construction that is here applicable
is that where there is no express repeal, the presumption
is that there was no repeal intended and both acts will stand
unless the conflicting provisions are so antagonistic and
repugnant that both cannot stand. Repeals by implication
are disfavored. 53 Tex.Jur. 2d 150-151, Statutes, Sec. 102.

> "The doctrine of implied repeal may not
> be invoked merely because there is some
> difference, discrepancy, inconsistency,
> or repugnancy between earlier and later
> legislation. In such a case the court

> will endeavor to harmonize and reconcile
> the various provisions, and if both acts
> can stand together, the rule is to let
> them stand."   53 Tex.Jur.2d 148-149, Stat-
> utes, Sec. 100.

While Article III, Section 49-d-1 of the Constitu-
tion authorizes the Texas Water Development Board to issue bonds
upon the direction of the Texas Water Quality Board, the author-
ity to do so is conditioned "upon such terms and conditions
as the Legislature may authorize by general law."  Furthermore,
it is then expressly provided that the bonds shall be issued
upon such "terms" and "conditions" as the Legislature may
authorize.  Consequently, the Constitution has left the matter
to the Legislature.

Section 21.603 merely provides that the Water Quality
Board "may use water quality enhancement funds to provide fi-
nancial assistance to political subdivisions".  Section 21.606
directs the Water Quality Board to submit applications for fi-
nancial assistance to the Water Development Board, together
with all comments and recommendations, in order that the latter
may take action thereon.  While the Water Quality Board is
empowered to pass upon the application and to approve or deny
it, in whole or in part, there is nothing in this statute that
takes away the separate power of the Water Development Board
also to exercise its separate statutory authority to pass upon
the security for bonds under Section 11.412.  This subject is
not mentioned in Section 21.606 and thus both sections may
stand and are not necessarily inconsistent or repugnant to
one another.

While Section 21.608 sets out two conditions for
obtaining financial assistance, these do not involve the sub-
ject of bond approval and security for bonds, which is dealt
with in Section 11.412.  Section 21.608 does not recite that
the two conditions shall constitute the only conditions but
rather relate only to the approval required by the Water Quality
Board under Chapter 21 and any necessary implementing order
to be issued by the political subdivision.  Consequently, this
Section may be harmonized with Section 11.412(b), it not being
necessarily incompatible therewith.

Finally, Section 21.609(e), providing for the delivery of funds by the Water Development Board, must be read together with 21.609(d), which expressly makes the issuance and selling of the bonds subject to the manner provided for in Chapter 11 of the Code. Hence, there is no antagonism with Chapter 11, that is, Section 11.412(b), which cannot be deemed repealed by implication.

We now proceed to the next three questions which we will consider together.

> **Question 4.** Does Section 7.10 of Article 7621d-1 establish a new additional debt-financing power for political subdivisions of the State which is unaffected by other legal financial limitations or procedural requirements applicable to the political subdivisions? For example, does Section 7.10(d) authorize a city to pledge the revenues of an existing water works or electric system in an amount exceeding $10,000 to secure a "direct loan" without the referendum required by Article 1112, Vernon's Civil Statutes?

> **Question 5.** Is the Water Quality Board required to specifically find that the political subdivision is unable to issue bonds and has sources of revenues which can be pledged of not less than the amount necessary to repay the principal and interest of the loan over a period of time to be specified in the loan agreement before approving an application for a "direct loan"?

> **Question 6.** Are the Water Quality Board's findings with respect to a specific application for a "direct loan" conclusive on the Water Development Board?

The Section 7.10 referenced in Question 4 is now
Section 21.610, Texas Water Code, and covers "Direct Loans"
to be repaid by a repay contract without the issuance of
bonds by a political subdivision.  The question of when a
"debt" is created by various legal entitities of the state
is governed by a separate body of law and we are unable to
answer your Question 4 without more facts.  It is the general
rule that a "debt" is not created by a political subdivision
if only revenues are pledged, or if the payment is to be
made from some currently existing fund.  City of Nederland
vs. Callihan, 299 S.W.2d 380, (Tex.Civ.App. 1957, error ref.
n.r.e.); San Antonio River Authority vs. Shepperd, 157 Tex.
73, 299 S.W.2d 920 (1957); Cameron County W.C.I.D. No. 8 vs.
Western Metal Mfg. Co. of Texas, 125 S.W.2d 650, (Tex.Civ.App.
1939, writ dism., judgm.cor.); Wichita County vs. Griffin,
284 S.W.2d 253, (Tex.Civ.App. 1955, error ref. n.r.e.);
Spears vs. City of South Houston, 136 Tex. 218, 150 S.W.2d
74, (Tex.Com.App. 1941); Bexar County vs. Hatley, 136 Tex.
354, 150 S.W.2d 980 (1941).  It is also the rule that a
district created under Article XVI, Section 59 of the Texas
Constitution cannot issue tax bonds without a vote of the
people.  Brown County Water Improvement District vs. Austin
Mill & Grain Co., 135 Tex. 140, 138 S.W.2d 523 (1940), holds
as follows:

> "The words 'any indebtedness' are
> emphatic and inclusive.  We are called upon,
> however, to say that the word 'indebtedness'
> in this provision does not have the same
> broad meaning or significance which it un-
> doubtedly has in the preceding subdivisions
> where it is used.  The contention is that
> as here used it has the restricted meaning
> given to the word 'debts' in Section 5,
> Article 11, of the Constitution pertaining
> to cities and towns.  See McNeill v. City of
> Waco, 89 Tex. 83, 33 S.W.322.  We perceive
> no reason for giving this word this special
> meaning, when its true meaning is clearly
> apparent from its own context.  It is a
> general rule that words are usually given
> a broad and liberal meaning, if necessary,
> in order to effectuate the purpose of the
> constitutional provision of which they are
> a part.  It may be safely said that one of

the dominant purposes of the constitutional
provision in question was to prevent the
burdening of property with tax liens, ex-
cept with the approval of the taxpayers
themselves, formally expressed in an elec-
tion for that purpose.  So, in light of
this manifest purpose, it is plain that the
'indebtedness' mentioned in this provision
is exactly the same indebtedness mentioned
in Subdivision (e), where it is said, 'such
indebtedness shall be a lien upon the property
assessed for the payment thereof.'"  (Emphasis
added.)

We, therefore, hold that each applicant for use of
water quality enhancement funds must satisfy each agency that
it has lawful authority to make repayment to the revolving
fund.  Article 1112 relating to cities plainly provides for
an election in certain cases mentioned therein.  Under the
Brown County case, supra, a direct loan for purposes mentioned
in the statute repayable in whole or in part out of taxes
would require an election as it would be a form of "indebted-
ness" covered thereby.

In answer to Question 5, there is a necessity for
the Texas Water Quality Board to make its fact findings as
to the ability of an applicant for a water quality enhance-
ment loan to issue bonds.  Subdivision (2) of Section 21.607,
Texas Water Code, specifically requires the Water Quality
Board to consider "the availability of revenue...for the
ultimate repayment of...cost...including interest"; and
under Subdivision (a) of Section 21.610, "the judgment of
the [Texas Water Quality] board" is required before its ap-
proval is given.  In view of our analysis of the nature of
the revolving fund and the present statutory language which
permits only loans (as distinguished from gifts or grants),
Water Quality Board findings as to the inability of applicant
to issue bonds is not conclusive on the Texas Water Develop-
ment Board.

A favorable or unfavorable finding by the Texas
Water Quality Board as to the inability of the applicant to
issue bonds would still be reviewable for abuse of discretion
by a Travis County District Court or by a District Court in

the county of residence of applicant.  Section 21.451, Texas
Water Code (Water Quality Board appeals).  Because there is
no appeal statute, an unfavorable finding toward applicant
by the Texas Water Development Board would not be appealable
unless it violated some constitutional right of the applicant
or adversely affected the property rights of the political
subdivision affected by the order.  Richardson vs. Alsup,
380 S.W.2d 923, (Tex.Civ.App. 1964, error ref.); White Top
Cab Co. vs. Houston, 440 S.W.2d 732, (Tex.Civ.App. 1969,
no writ); Chemical Bank & Trust Co. vs. Falkner, 369 S.W.2d
427 (Tex.Sup. 1963); 1 Tex.Jur.2d, Administrative Law and
Procedure, Sec. 34, pages 673-74; 12 Tex.Jur.2d, Const. Law,
Sec. 100, page 449.

In submitting questions five through nine, you have
included elaborate examples giving fact situations for hypo-
thetical city "A" and hypothetical district "B".  The various
details of these examples are not here repeated and we note
only the basic assumptions that you pose in the examples.  The
assumptions are all we need to consider in answering the ques-
tions.  In the case of hypothetical city "A", you assume that
the Development Fund Manager believes that the city can issue
tax bonds but that city bond counsel disagrees.  In your hypo-
thetical district "B", you assume that the Development Fund
Manager has found that the entity can issue revenue bonds,
but that the Water Quality Board wants to grant such district
a direct loan.

Questions 7, 8, and 9 will be considered together.

Question 7.   Assuming the Joint Rules of the
Water Quality Board and the Water
Development Board are silent on the
subject and Subchapter G of Arti-
cle 7621d-1 is the only applicable
statute, are City A and District B
eligible for a direct loan?

Question 8.   Under Subchapter G of Article 7621d-1
and the Joint Rules, are City A and
District B eligible for a direct loan?

> Question 9.  What is the responsibility and
> authority of the Water Develop-
> ment Board in the two fact situ-
> ations considering the provision
> of Section 7.10(b) which requires
> the agreement of the Water Develop-
> ment Board to the period of time
> and terms and conditions of a
> "direct loan"?

In regard to Questions 7, 8 and 9, we cannot make the assumptions called for in Question 7. To answer any question it is necessary to consider Article III, Section 49-c, 49-d and 49-d-1 of the Texas Constitution, together with any related statutes such as Chapter 11 of the Texas Water Code (formerly Art. 8280-9) and Chapter 21 thereof (formerly Art. 7621d-1). These constitutional provisions and the laws relating to Texas Water Development Board and Texas Water Quality Board are to be read in pari materia so as to harmonize both chapters of the Water Code with each other and with the Texas Constitution.

Turning to the Questions 7, 8 and 9, there is a mixed question of fact and of law as to whether any applicant for a "direct loan" is unable to issue bonds. As stated earlier, any Texas Water Quality Board determination of this matter would be appealable and would be reviewable by a District Court. Section 21.451, Texas Water Code. A favorable decision toward applicant by Texas Water Quality Board would still be subject to Texas Water Development Board review and the decision of this latter agency is final. There is no appeal since the applicant would have no vested right simply by making the application for a loan. Richardson vs. Alsup and authorities cited supra herein.

In both examples, (City "A" and Water District "B"), we are not advised as to whether the Texas Water Development Board has followed the advice of the Development Fund Manager. If so, Texas Water Quality Board would be bound by the Development Board findings that bonds could not be issued. If not, the Development Fund Manager's comments would be only advisory to Texas Water Quality Board and such would be considered like any other evidence by Texas Water Development Board when it considered the matter of a loan to a political subdivision

after a favorable Water Quality Board finding had been made.
A Water Quality Board finding adverse to applicant for a
"direct loan" under Section 21.610, Texas Water Code, would
end the matter unless there was an appeal to court; even then,
Texas Water Development Board would still have the final deci-
sion as to the eligibility of applicant for a "direct loan".
To hold otherwise would strip the Texas Water Development
Board of its constitutional powers to manage, safeguard and
administer the Texas Water Development Fund.   11 Am.Jur.,
Constitutional Law, Sec. 194, page 897; 12 Tex.Jur.2d, Const.
Law, Sec. 13, page 361; Houchins vs. Plainos, 130 Tex. 413,
110 S.W.2d 549 (1937).

The Legislature cannot act to deprive the Water
Development Board of its duties for this has not been taken
away by the terms of Article III, Section 49-d-1.  It is evi-
dent that the Legislature in its enabling legislation recog-
nized the need for the Texas Water Development Board to ad-
minister the fund on a loan basis rather than as a grant of
money without repayment thereof.  Section 11.401, et seq.,
Texas Water Code; Tex. Const., **Art**. III, Sec. 49-c, 49-d
and 49-d-1 and Subchapter I, (Sections 21.601 - 21.612),
Texas Water Code.

This opinion does not seek to decide any question
of eligibility as to City "A" and District "B" other than
to advise as to what agencies shall make the decisions.  Such
a decision, beyond showing the need for approval by both agen-
cies, must remain for consideration by bond counsel or by the
Attorney General under the facts of each specific case.

Finally, we dispose of your last question.

Question 10.    What information should be sub-
                mitted to the Attorney General
                to obtain his approval that a
                loan agreement is lawful and that
                the payments required can be made
                from the sources pledged?

Section 21.610(e) provides for a review of any "direct
loan" agreement before it is consummated; the Section reads as
follows:

> "(e)  Each loan agreement executed pur-
> suant to this Act, and the appropriate pro-
> ceedings authorizing its execution, shall be
> submitted to the attorney general for exami-
> nation before the delivery of the money to the
> political subdivision.  If he finds that the
> loan agreement has been authorized and executed
> in accordance with the law, that the provisions
> are valid, and that the political subdivision
> has demonstrated to his reasonable satisfaction
> that the payments required by the agreement can
> be made from the sources pledge, he may approve
> the agreement."

If bonds were issued, a bond transcript would contain among other documents all charters, resolutions, orders, election results, State agency approvals, etc., necessary to show the authority of the issuer and the legal validity of the bonds. Such information would also be required by the Attorney General as to a direct loan transaction.  Generally this would include a transcript showing authority of the applicant to enter into contract with the State of Texas, any election results if such were needed to authorize the contract, authority for any contract provisions, and a repayment schedule demonstrating to the satisfaction of the Attorney General "that the payments required by the agreement can be made from the sources pledged". This repayment schedule would normally be prepared by the bank-ing experts at Texas Water Development Board, for such would be an integral part of any determination by the constitutional agency of the State that the business transaction is a reason-able one for the State to enter upon.

As a general rule of policy, the Attorney General does not look beyond the findings of fact made by political subdivisions or state agencies, except where he has actual notice that such findings are either erroneous or fraudulent.

The code provision permitting direct loans, where "...a political subdivision in the judgment of the board is unable to issue bonds or other obligations....", could be the source of considerable confusion and difficulty in ob-taining the Attorney General's approval for such contracts. Such a finding relating to a small remote town or political

subdivision, could on its face represent a reasonable appli-
cation of the board's discretion, whereas a like finding re-
lating to one of the State's major cities might be manifestly
absurd, indicating an abuse of board discretion on its face.

It would appear therefore, that some policy deci-
sion will have to be made regarding what the Attorney General
may require by way of documentation as to a political subdivi-
sion's inability to issue bonds or other obligations if and
when such direct loan agreements are submitted for his approval.
Without formulating a policy decision in this opinion, it
would seem obvious that one simple way to demonstrate inability
to obtain conventional financing would be a showing by the
political subdivision that it has attempted a good faith com-
petitive sale of its securities and received no bids therefor.

## S U M M A R Y

Any financial assistance by the State
for construction of waste water treatment
facilities under Subchapter I (Sections
21.601, et seq.), Texas Water Code, must
be approved by both the Texas Water Quality
Board and the Texas Water Development Board.

Supervision of the lending procedures
where a direct loan procedure is pursued
pursuant to Section 21.610, Texas Water
Code, will require additional approval by
the Attorney General and this will consist
of the usual matters contained in a bond
transcript.

Disapproval of an applicant for fi-
nancial assistance by the Texas Water Qua-
lity Board forecloses any loan or contract
under Subchapter I, Texas Water Code, by
the Texas Water Development Board. Water
Quality Board approval is not conclusive
on the Water Development Board decision as
to such application for a loan.

The present statute does not cover
a "grant" and only loans presently can be
made.

Yours very truly,

CRAWFORD C. MARTIN
Attorney General of Texas

Prepared by Roger Tyler
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Kerns Taylor, Chairman
W. E. Allen, Co-Chairman

Joseph Sharpley
J. C. Davis
Houghton Brownlee
Lynn Taylor

SAMUEL D. McDANIEL
Staff Legal Assistant

ALFRED WALKER
Executive Assistant

NOLA WHITE
First Assistant